Lynn Lincoln Sarko, *pro hac vice forthcoming*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900; (206) 623-3384
lsarko@kellerrohrback.com

Juli Farris, SBN 141716
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496; (805) 456-1497
jfarris@kellerrohrback.com

Elizabeth Cabraser, SBN 83151
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415) 956-1000; (415) 956-1008
ecabraser@lchb.com

David S. Stellings, *pro hac vice forthcoming*
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500; (212) 355-9592
dstellings@lchb.com

**Attorneys for Plaintiffs**
**Additional Counsel Listed on Signature Page**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| GLENN GOODROAD, JR., RICHARD CASTRO, ALAN FLANDERS, EDWARD HATTEN, MICHAEL KING, WILLIAM MCKNIGHT, LUTHER "ED" PALMER, DON RECKER, IVAN TELLEZ, BRIAN URBAN AND CHRISTINA BOUYEA, VALUE ADDITIVES LLC, AND MICHAEL WILSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>                                        Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, JAMES HACKETT, MARK FIELDS, ROBERT BOSCH GMBH, ROBERT BOSCH LLC, and VOLKMAR DENNER,<br><br>                                        Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1
II. PARTIES ..... 5
A. Defendants ..... 5
1. Ford Motor Company ..... 5
2. Bosch Defendants ..... 6
B. Plaintiffs ..... 9
Glenn Goodroad, Jr. ..... 9
Richard Castro ..... 10
Alan Flanders ..... 10
Edward Hatten ..... 10
Michael King ..... 11
William McKnight ..... 11
Luther “Ed” Palmer ..... 12
Don Recker ..... 13
Ivan Tellez ..... 13
Brian Urban and Christina Bouyea ..... 13
Value Additives LLC ..... 14
Michael Wilson ..... 14
III. JURISDICTION AND VENUE ..... 15
IV. INTRADISTRICT ASSIGNMENT ..... 17
V. FACTS COMMON TO ALL COUNTS ..... 17
A. History of the F-Series Trucks ..... 18
B. The Unique Power Offered by Diesel Engines Comes at a High Cost for the Environment ..... 19

C.    Ford Introduced the 6.7-liter Power Stroke Diesel Engine in its 2011 F-250 and F-350 Super Duty Diesels to Address Stricter Environmental Regulations ................................................................................21

D.    Ford Intentionally Hid the Excessive and Illegal Levels of Pollution Emitted From Its Trucks ....................................................................23

E.    Ford Claims That It Is Concerned With Reducing Harmful Emissions and Improving Fuel Economy .......................................................24

F.    Defendants Promised Consumers That Their "Cleanest" Super Duty Diesel Trucks Could Achieve Fuel Efficiency and Emissions Compliance Without Sacrificing Performance .............................................25

G.    Defendants' Dirty "Defeat Device" Scheme .............................................29

H.    Laboratory and Road Testing ....................................................................30

       1.    2013 F-350 Testing.......................................................................32

       2.    2017 F-350 Testing.......................................................................33

       3.    Cross-Country Testing ..................................................................36

I.    Bosch and Ford Conspired To Develop and Implement the Emissions Technology in the Class Vehicles ...............................................................37

J.    Defendants Profited Handsomely from the Class Vehicles .......................39

K.    The Defendants' Actions Caused Class Members Significant Harm .........40

VI.   CLASS ACTION ALLEGATIONS ........................................................................41

       1.    Numerosity: Federal Rule of Civil Procedure 23(a)(1) ...............42

       2.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3) ...................................................42

       3.    Typicality: Federal Rule of Civil Procedure 23(a)(3) ..................44

       4.    Adequacy: Federal Rule of Civil Procedure 23(a)(4)....................44

       5.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2) ........................................................................45

       6.    Superiority: Federal Rule of Civil Procedure 23(b)(3)..................45

VII.  ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED ..................45

A.    Discovery Rule Tolling ..............................................................................45

B.      Tolling Due to Fraudulent Concealment ................................................46

C.      Estoppel ................................................................................47

VIII.  CAUSES OF ACTION ................................................................47

COUNT I  RACKETEER INFLUENCED AND CORRUPT
       ORGANIZATIONS ACT ("RICO") (18 U.S.C. §§ 1961, et seq.) ...........................47

     1.     Description of the SDD Enterprise ................................................49

          a.     The Ford Defendants ................................................50

          b.     The Bosch Defendants ................................................51

          c.     Structure of the Association-in-Fact Enterprise ................................52

     2.     The Common Purpose: Unlawfully Increasing Profits and
         Revenues ................................................................55

     3.     Mail And Wire Fraud ................................................56

COUNT II  FRAUD BY CONCEALMENT (Common Law) ................................65

IX.   REQUEST FOR RELIEF ................................................................67

X.    DEMAND FOR JURY TRIAL ................................................................68

# I.     INTRODUCTION

1.      This nationwide class action involves Ford's promotion, sale, and leasing of trucks equipped with 6.7-liter Power Stroke diesel engines ("Power Stroke"). Ford markets and sells these vehicles as fuel-efficient, reliable, with best-in-class performance and significantly reduced emissions—a cleaner alternative to the high-polluting diesels of old. But these diesels are dirty. Like the well-known Volkswagen "Clean Diesel" vehicles, Ford equips these trucks with an illegal software algorithm—a "defeat device"—designed to cheat federal and state emission testing for oxides of nitrogen ($NO_X$), thereby deceptively inducing regulators to certify for sale hundreds of thousands of non-compliant vehicles, and hundreds of thousands of consumers to buy or lease dirty diesels, thinking they are clean and emissions compliant.

2.      Regulators have sought to combat the harmful effects of vehicle emissions on climate change by imposing stricter environmental regulations on auto manufactures and requiring vehicles to emit fewer pollutants and increase fuel economy. When a manufacturer wishes to introduce a new vehicle in the U.S. market, it must obtain a Certificate of Conformity ("COC") from the Environmental Protection Agency ("EPA"), by showing that the vehicle comports with the requirements of the Clean Air Act ("CAA"), 42 U.S.C. § 7522 and 40 CFR 86.1843-01. To comply with similar requirements under California law, manufacturers must receive an Executive Order ("EO") from the California Air Resources Board ("CARB"). Regulators test vehicles to ensure compliance with these regulations.

3.      A "defeat device," as defined by the EPA, is any apparatus or technology that unduly reduces the effectiveness of emissions control systems under normal driving conditions. A defeat device "defeats" the vehicle's own emissions controls in certain situations during real-world driving, while activating its emissions control systems only when the vehicle is being tested. Vehicles with defeat devices thus test as clean; but in reality, they are dirty.

4.      Ford's famous "F-Series" trucks have been the best-selling line of pickup trucks in the United States for more than 40 years. The F-Series includes both light-duty trucks like the F-150 model and heavy-duty trucks like the F-250, F-350, and F-450 models at issue in this action. Ford markets these trucks as "Super Duty."

5.      Ford's F-250, F-350, and F-450 diesels are heavy-duty trucks known and marketed for their power—torque, horsepower, and towing capability—and their reliability. But like many large vehicles, heavy-duty trucks are notoriously fuel inefficient. One way that Ford has combatted this shortcoming is by using diesel engines, which tend to be more fuel-efficient than gasoline engines. They are also reliable, but do not sacrifice power. This combination makes diesel engines particularly well-suited for the Super Duty trucks.

6.      But the benefits of diesel—power, fuel economy, and reliability—come at a high cost to human health and the environment. Diesels traditionally emit high levels of NOx, a pollutant that is linked with both serious health danger and environmental harm. Specifically, NOx contributes to respiratory illness, and reacts with other atmospheric gases, particles, and compounds, to produce smog, ground level ozone, haze, and acid rain.

7.      The promise of modern, "clean," diesel engines like Ford's and Volkswagen's is that they could deliver the power, fuel efficiency, and reliability of diesel without the traditional emissions drawback. Consumers were promised this full package in a vehicle they reasonably understood to be compliant with the law.

8.      This promise was literally too good to be true. Ford could not achieve the fuel economy, power, and reliability that it promised for the Class Vehicles without cheating on emissions—a fact that it concealed from consumers around the country. So, it decided to cheat. To make matters worse, it is unlikely that the emissions problem can be fixed with a technical remedy or recall without diminishing the promised fuel economy or performance consumers paid for, if not both. Any repairs

or retrofits to the Class Vehicles to bring them into compliance with emission requirements will undoubtedly cause the vehicles to suffer lower performance, durability, and reliability, thereby increasing the cost of ownership and operation.

9.    To create the illusion that it had complied with stricter emission standards in effect starting in 2010, Ford first rolled out the 6.7-liter Power Stroke diesel engine in the 2011 F-250 and F-350 models, which it continues to use in these models and the F-450 today. This was a significant change. Prior to the 2011 models, Ford sourced its heavy-duty diesel engines from Navistar. With the new emission standards, Ford promised that its new Power Stroke—developed in-house with the help of Bosch programming and engine parts—provided more horsepower and torque than ever, while simultaneously improving fuel economy and reducing $NO_X$ emissions by 80 percent from its previous model.

10.    Consumers believed these representations and bought and leased more than 500,000 vehicles with the Power Stroke engine. Unwittingly, these consumers are among the highest polluters on the road, despite having paid a premium of more than $8,000 for vehicles that purportedly offered all benefits of diesel engines while remaining emissions-compliant. Ford's warranties, marketing, and other statements about the vehicles' qualities were false and misleading.

11.    But Ford did not act alone. Bosch GmbH and Bosch LLC, along with CEO Volkmar Denner, were active and knowing participants in the scheme to cheat emissions testing in order to achieve too-good-to-be-true performance and fuel economy. Bosch designed, created, and tested the electronic diesel control ("EDC") units included in the Power Stroke diesel engine, among numerous engine and emissions parts, that allowed Ford to "pass" emission tests for its COC and EO applications, thus deceiving the EPA and CARB into approving the Class Vehicles for sale throughout the United States.

12.     Plaintiffs and Class members are individuals and businesses who purchased or leased a Class Vehicle in the United States. The Class Vehicles include the 2011–2018 F-250, F-350, and F-450 trucks equipped with 6.7-liter Power Stroke diesel engines.

13.     Defendants induced Plaintiffs and Class members to purchase or lease the Class Vehicles, which were certified for sale under state and federal law only through Ford's and Bosch's deception. Class members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known the truth of Defendants' fraudulent scheme. More simply, no reasonable consumer would or could have purchased the Class Vehicles if they knew that the vehicles were not actually legal to be sold in the United States.

14.     Plaintiffs have suffered economic damages including, but not limited to, the $8,000-plus premium they paid to purchase the Class Vehicles as opposed to comparable gas models (or, for lessees, a similar premium for their leases).

15.     On behalf of themselves and the Class, Plaintiffs bring this action for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq. ("RICO")) and for common-law fraudulent concealment. Plaintiffs are consumers. They do not seek to enforce or impose new or different emissions regulations on Defendants. They do, however, expect and demand to own and lease vehicles that are sold in compliance with the law.

16.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles as defined herein. Plaintiffs seek a buyback program for the Class Vehicles, monetary damages (including but not limited to treble damages under RICO), pollution mitigation, and injunctive and other equitable relief for Defendants' misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles, as alleged in this Complaint. Plaintiffs and Class members are also entitled to a significant award of punitive or exemplary damages because Defendants deliberately deceived them, disregarded their rights to make free and

informed consumer choices, damaged them economically, and used them as unwitting puppets in a scheme that impaired public health and the environment.

## II.    PARTIES

**A.    Defendants**

**1.    Ford Motor Company**

17.    Defendant **Ford Motor Company ("Ford")** is a Delaware corporation with its principal place of business at One American Road in Dearborn, Michigan 48126. Ford also operates a Research and Innovation Center in Palo Alto, California.

18.    With approximately 202,000 employees worldwide, Ford is in the business of designing, manufacturing, and distributing motor vehicles under the Ford and Lincoln brands. It is one of the "Big Three" American automakers (with General Motors and Fiat Chrysler). In 2017 alone, Ford sold or leased approximately 6,607,000 new vehicles worldwide.

19.    Ford has designed, manufactured, distributed, offered for sale, sold, and leased thousands of vehicles that include its 6.7-liter Power Stroke diesel engine—including the F-250, F-350, and F-450 "Super Duty" trucks—with the knowledge and intent to market, sell, and lease them in all 50 states and the District of Columbia. Franchised dealers act as Ford's agents in selling and leasing vehicles and disseminating vehicle information provided by Ford to customers. In addition, Ford provides financial services—namely, auto loans and leases—through Ford Motor Credit Company LLC.

20.    Ford developed and disseminated owners' manuals, warranty booklets, product brochures, marketing, and other promotional materials relating to the Class Vehicles, with the intent that such documents should be purposely distributed throughout all 50 states and the District of Columbia. Ford is engaged in interstate commerce, selling vehicles through its franchised dealer network in every state of the United States.

21.     Ford employees oversaw or were responsible for approving elements of design and/or strategies related to emission compliance for the Class Vehicles, including interaction with the EPA and CARB in the certification process.

22.     Defendant **James "Jim" Hackett ("Hackett")** has been the President and CEO of Ford Motor Company since May 22, 2017. Hackett has served on the Board of Directors for Ford Motor Company since 2013. Prior to being appointed President and CEO, Hackett was chairman of Ford Smart Mobility LLC, a subsidiary of Ford formed to accelerate the company's plans to design, build, grow and invest in emerging mobility services.

23.     Defendant **Mark Fields ("Fields")** served as President and CEO of Ford Motor Company from July 1, 2014 until his retirement on May 22, 2017. Before being appointed President and CEO, Fields was Ford's Chief Operating Officer.

### 2.     Bosch Defendants

24.     Defendant **Robert Bosch GmbH ("Bosch GmbH")**—a German multinational engineering and electronics company headquartered in Gerlingen, Germany—is the parent company of Defendant **Robert Bosch LLC ("Bosch LLC" or, with Bosch GmbH, "Bosch")**, a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.

25.     Both Bosch GmbH and Bosch LLC operate under the umbrella of the "Bosch Group," which encompasses some 340 subsidiaries and related companies. Defendant **Volkmar Denner ("Denner")** is the Chairman and CEO of Bosch GmbH and leader of The Bosch Group. Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the programming and parts that were installed in the Class Vehicles.

26.     The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. Bosch's sectors and divisions are grouped not by location, but by function. In other words, Mobility Solutions includes knowledgeable individuals at both Bosch GmbH and Bosch LLC. Regardless of whether an individual works for Bosch in Germany or the United States, the employee holds him or herself out as working for Bosch. This collective identity is captured by Bosch's mission statement, a unifying principle that links each entity and person within the Bosch Group: "We are Bosch."

27.     Mobility Solutions is the largest Bosch Group business sector. The Mobility Solutions sector consists of several divisions, including "Diesel Systems". As described in Bosch's 2016 Annual Report: "The Diesel Systems division is a systems supplier of key powertrain components. The division offers an extensive range of energy efficient, eco-friendly diesel injection systems for applications ranging from passenger cars and all kinds of commercial vehicles to large-scale industrial power-generation units. It focuses primarily on the common-rail system, which comprises a high-pressure injection pump, the rail, and various injectors (solenoid and piezo). The division also provides air management systems such as mass air-flow sensors, electronic diesel control, and exhaust-gas management systems such as Denoxtronic, as well as solutions for diesel hybrid vehicles and in the field of fuel cells."

28.     In 2016, Bosch generated sales of $80.9 billion worldwide and $13.7 billion in North America. The same year, Bosch saw the strongest growth in its Mobility Solutions business sector. In North America alone, this sector represented 67 percent of total sales revenue, or $9.2 billion, and a total of 22,304 associates between the United States, Canada, and Mexico.[1]

---

[1] https://www.bosch.us/our-company/bosch-in-the-usa/





29.     Bosch embeds sales and engineering personnel at customer offices and facilities around the world, including automakers like Ford, to work directly on the design, sale, calibration, and configuration of the parts it supplies.

30.     Bosch operates 100 locations in the United States, with over 32,800 employees. In 2016, Bosch invested more than $450 million in North America.

31.     Bosch developed, tested, configured, manufactured, and supplied the engine fuel injection and emissions selective catalytic reduction systems, as well as the ECM programming to run them, knowing and intending that the Class Vehicles, along with the device, would be marketed, distributed, warranted, sold and leased throughout all 50 states and the District of Columbia. As set forth in detail herein, Bosch and Ford worked collaboratively to program the engine and emissions control systems in the Class Vehicles.

32.     From as early as 2009 through 2018, Bosch and its employees knowingly and actively participated in the creation, development, marketing, and sale of engine and emissions control software and parts designed to evade emission requirements in vehicles sold in the United States. These vehicles include the F-250, F-350, and F-450 Super Duty Diesel trucks, as well as diesel engines made by other automakers such as Fiat Chrysler, Volkswagen, Audi, and Porsche.

33.     Bosch participated not just in the development of these devices, but also in the scheme to prevent U.S. regulators from uncovering their true functionality. Moreover, Bosch's participation was not limited to engineering these devices. In fact, Bosch marketed "clean diesel" technology in the United States. Bosch was therefore a knowing and active participant in the scheme or common course of conduct with Ford and others to defraud regulators and consumers in the United States.

**B.    Plaintiffs**

### Glenn Goodroad, Jr.

34.     Plaintiff **Glenn Goodroad, Jr.**, a Florida citizen and resident of Tampa, Florida, purchased a new 2015 F-250 equipped with a 6.7-liter Power Stroke diesel engine from Parks Ford of Wesley Chapel in Wesley Chapel, Florida, for approximately $48,100 in or about September 2015, and a new 2016 F-350 equipped with a 6.7-liter Power Stroke diesel engine from Elder Ford in Tampa, Florida, for approximately $60,300 in or about May 2016. Plaintiff subsequently traded in the 2015 F-250 for a value of approximately $42,500 in or about May 2017 to General RV Center in Tampa, Florida. Plaintiff purchased the 2016 F-350 to haul his RV, among other reasons. In or about July 2017, Plaintiff brought his 2016 F-350 to an authorized Ford dealership for an engine issue said to be caused by the emissions sensors, which was repaired under warranty. After the repair, Plaintiff noticed a significant loss of power when towing. When Plaintiff subsequently took the truck to another authorized Ford dealership, the service technician inspected the engine and emissions system and informed Plaintiff. that his vehicle was operating properly. Plaintiff would not have purchased the

trucks or would have paid less for them if he had been aware that they emitted more pollutants than would reasonably be expected and did not comply with U.S. emissions standards.

### Richard Castro

35.     Plaintiff **Richard Castro**, a California citizen and resident of Hollister, California, purchased a 2012 Ford F-250 equipped with a 6.7-liter Power Stroke diesel engine from Tiffany Ford in Hollister, California for approximately $54,000 in or about March 2013. Mr. Castro purchased the truck because he wanted increased power and towing capacity from his 2010 Ford F-150, which he traded in toward the purchase of the 2012 F-250. Mr. Castro primarily uses the truck to pull a 40-foot camping trailer. Mr. Castro would not have purchased the truck or would have paid less for it if he had been aware that the truck emitted more pollutants than would reasonably be expected and did not comply with U.S. emissions standards.

### Alan Flanders

36.     Plaintiff **Alan Flanders**, a South Carolina citizen and resident of Bluffton, South Carolina, purchased a used 2012 Ford F-350 equipped with a 6.7-liter Power Stroke diesel engine from O.C. Welch Ford Lincoln, Inc., in Hardeeville, South Carolina, for approximately $26,000 on or about December 16, 2016. Mr. Flanders purchased the truck to haul his camper trailer, among other reasons. Mr. Flanders would not have purchased the truck or would have paid less for it if he had been aware that the truck emitted more pollutants than would reasonably be expected and did not comply with U.S. emissions standards.

### Edward Hatten

37.     Plaintiff **Edward Hatten**, a citizen of Missouri and resident of West Plains, Missouri, purchased a 2015 Ford F-250 equipped with a 6.7-liter Power Stroke diesel engine from Bob Hurley Ford in Tulsa, Oklahoma for approximately $68,000 in or around September 2015. Mr. Hatten required a truck with enough power to tow large trailers and other vehicles. Mr. Hatten test drove

other diesel vehicles, but ultimately purchased the Ford due to best-in-class torque, throttle

responsiveness, and Ford's reputation for quality. Mr. Hatten would not have purchased the truck or

would have paid less for it if he had he been aware that the truck emitted more pollutants than would

reasonably be expected and did not comply with U.S. emissions standards.

**Michael King**

38.    Plaintiff **Michael King**, an Alaska citizen who currently resides in Lugoff, South

Carolina, purchased a 2016 Ford F-350 equipped with a 6.7-liter Power Stroke diesel engine from

Kendall Ford of Wasilla in Wasilla, Alaska, for approximately $68,000 on or about August 29, 2015.

Mr. King is now stationed at an Air Force base in Sumter, South Carolina. He purchased the truck

prior to his move from Alaska to South Carolina, and he needed sufficient room and power for that

move and other uses. Mr. King would not have purchased the truck or would have paid less for it if he

had been aware that the truck emitted more pollutants than would reasonably be expected and did not

comply with U.S. emissions standards.

**William McKnight**

39.    Plaintiff **William McKnight**, a Texas citizen and resident of Ravenna, Texas,

purchased a 2014 Ford F-350 equipped with a 6.7-liter Power Stroke diesel engine from Classic of

Texoma in Denison, Texas for approximately $40,000 on or around February 16, 2018. Mr. McKnight

required a truck with enough power to move farm equipment and cattle. Mr. McKnight test drove

many different makes of trucks and found the F-350 the best fit for his needs. Mr. McKnight would

not have purchased the truck or would have paid less for it if he had he been aware that the truck

emitted more pollutants than would reasonably be expected and did not comply with U.S. emissions

standards.

**Luther "Ed" Palmer**

40.     Plaintiff **Luther "Ed" Palmer**, a Georgia citizen and resident of Sylvester, Georgia, purchased a new 2017 Ford F-250 equipped with a 6.7-liter Power Stroke diesel engine from William Mizell Ford, in Waynesboro, Georgia, for approximately $60,000 on or about August 10, 2017. Mr. Palmer purchased the truck to tow a fifth wheel trailer, among other reasons. Mr. Palmer believed that Ford diesel trucks had excellent power and fuel economy. In or about February 2018, Mr. Palmer brought his truck to Sunbelt Ford, Inc. of Sylvester, Georgia for work unrelated to the emissions issue detailed in this Complaint. At that time, the dealership informed him that they were going to "update" the "ECM, TCM, and DEF module" on his truck—components of the vehicle's emissions system. Shortly after the update, Mr. Palmer noted that his truck experienced a reduction in fuel economy of approximately 5 MPG. He requested a service report from the dealer for the February 2018 visit documenting the changes to the emissions system, but did not receive one after being assured twice that it would be mailed. When he returned to the dealer, he was given a service report for the February 2018 visit that did not list the ECU, TCM, and DEF module update that had been performed. Mr. Palmer called Ford directly to complain about the decreased fuel economy, and in or about April 2018, an additional update was applied to his truck. The truck's fuel economy improved slightly after the April 2018 update, but remains worse than before the February 2018 update. Mr. Palmer has since tried, unsuccessfully, to sell his truck. Mr. Palmer has a bachelor's degree in environmental soil science and associate's degree in biology. He is environmentally conscious and is concerned about excessive pollutants. Mr. Palmer would not have purchased the truck or would have paid less for it if he had been aware that the truck emitted more pollutants than would reasonably be expected and did not comply with U.S. emissions standards.

**Don Recker**

41.     Plaintiff **Don Recker**, an Oklahoma citizen and resident of Eakly, Oklahoma, purchased a 2013 Ford F-250 equipped with a 6.7-liter Power Stroke diesel engine from Cummings Ford Lincoln in Weatherford, Oklahoma, for approximately $55,000 in or about August 2013. Mr. Recker purchased the vehicle for use on his peanut and cotton farm, which requires significant power. Mr. Recker would not have purchased the truck or would have paid less for it if he had been aware that the truck emitted more pollutants than would reasonably be expected and did not comply with U.S. emissions standards.

**Ivan Tellez**

42.     Plaintiff **Ivan Tellez**, a California citizen and resident of Concord, California, purchased a new 2016 Ford F-350 equipped with a 6.7-liter Power Stroke diesel engine from Future Ford in Concord, California for approximately $80,000 in or about August 2016. Mr. Tellez purchased the truck because he wanted increased power and towing capacity from his previous Ford F-250 with a gasoline engine. He required a truck with a strong towing capability that would allow him to haul trailers and trucks for his restaurant and food truck businesses. Mr. Tellez would not have purchased the truck or would have paid less for it, had he been aware that the truck emitted more pollutants than would reasonably be expected and did not comply with U.S. emissions standards.

**Brian Urban and Christina Bouyea**

43.     Plaintiffs **Brian Urban and Christina Bouyea**, citizens of New York and residents of Kingston, New York purchased a 2012 Ford F-350 equipped with a 6.7-liter Power Stroke diesel engine from Metro Ford in Schenectady, New York for approximately $37,000 on or around March 19, 2018. They required a truck with enough power to tow heavy loads and haul materials for their business. Mr. Urban and Ms. Bouyea purposely wanted a diesel vehicle due to the power. Mr. Urban and Ms. Bouyea would not have purchased the truck or would have paid less for it if they had been

aware that the truck emitted more pollutants than would reasonably be expected and did not comply with U.S. emissions standards.

### Value Additives LLC

44.    Plaintiff **Value Additives LLC**, a corporate entity organized under the laws of West Virginia and with a principal place of business in Morgantown, West Virginia, leases four Ford F-350s equipped with 6.7-liter Power Stroke diesel engines. Value Additives LLC leased all four trucks from Allied Truck Leasing, LLC in Mineral Wells, West Virginia, pursuant to a Master Lease Agreement dated January 22, 2018: (1) a 2017 F-350 leased on January 22, 2018, at a rate of $1378.78 per month; (2) a 2017 F-350 leased in February 2018 at a rate of $1594.95 per month; (3) a 2017 F-350 leased in February 2018 at a rate of $1529.52 per month; and (4) a 2017 F-350 leased in February 2018 at a rate of $1546.08 per month. Value Additives also paid lease initiation fees charged on each vehicle. Each of these leases runs for 24 months and up to 100,000 miles, with any overage charged at $0.20 per mile. Each lease includes an option to purchase at the end of the lease term. In conducting its business, Value Additives needs trucks with ample power to tow trailers, equipment and supplies. Managers and personnel at Value Additives LLC drove and considered other trucks but decided to lease the F-350 Diesels based on best-in-class towing capacity, torque, fuel economy, and Ford's reputation for quality. Value Additives LLC would not have leased any of the F-350s if they had known that the trucks emitted pollutants in excess of U.S. emissions standards.

### Michael Wilson

45.    Plaintiff **Michael Wilson**, a citizen of New Jersey and resident of Pine Hill, New Jersey purchased a 2015 Ford F-250 equipped with a 6.7-liter Power Stroke diesel engine from Porsche of Cherry Hill in Cherry Hill, New Jersey for approximately $46,000 in October 2017. He required a truck with strong towing capacity that combined with efficient gas mileage. Mr. Wilson would not have purchased the truck or would have paid less for it if he had been aware that the truck emitted

more pollutants than would reasonably be expected and did not comply with U.S. emissions standards.

### III.    JURISDICTION AND VENUE

46.    This Court has original subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964 (RICO). The Court also has original subject-matter jurisdiction pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

47.    This Court has personal jurisdiction over Defendants under California Code of Civil Procedure § 410.10 and 18 U.S.C. §§ 1965(b) and (d). This Court also possesses pendent personal jurisdiction over Defendants.

48.    This Court has personal jurisdiction over Defendants because Ford and Bosch conduct substantial business in California and have sufficient minimum contacts with California.

49.    One of Ford's two Research and Innovation Centers is located in Palo Alto. The Center is "one of the largest automotive research teams in the area and a major presence in one of the most dynamic, innovative business cultures in the world."[2] California is also the second largest market for sales of Ford's F-Series trucks,[3] and in 2017, Ford was reported to be a market share leader in California, selling 191,502 vehicles and 55,249 trucks in the state alone.[4] Significantly, the Ford F-Series trucks outsold *all* pure electric vehicles *combined* in California in 2017.[5]

50.    Bosch also has significant ties to California. For example, Palo Alto is home to the Bosch Research and Technology Center North America. This Center was originally founded close to

---

[2] https://corporate.ford.com/innovation/research-and-innovation-center.html
[3] https://www.fool.com/investing/general/2014/08/17/the-5-critical-states-where-ford-sells-the-most-f.aspx
[4] https://www.cncda.org/wp-content/uploads/California-Covering-4Q-2017.pdf
[5] https://www.cnbc.com/2018/02/16/even-as-california-embraces-electric-vehicles-pickup-trucks-still-rule-its-roads.html

20 years ago and continues to be an integral part of Bosch's North American operations. Just last year, Bosch announced that it was committing $40 million towards the expansion of the Center "aimed at inspiring collaboration and innovation."[6]

51.     In 2009, Bosch hosted an event in Sacramento called "California Diesel Days" to discuss the role of "clean diesel" vehicles in meeting strict environmental standards in California.



52.     Attendees at California Diesel Days from Robert Bosch LLC included Bernd Boisten, then Regional President of Diesel Systems North America, and Dr. Johannes-Joerg Rueger, then Senior Vice President of Engineering for Diesel Systems.[7]

---

[6] https://www.businesswire.com/news/home/20170420006561/en/Bosch-Invests-Silicon-Valley-Operation-Announces-Expansion
[7] http://www.californiadieseldays.com/

53.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, as set forth in more detail below, and because Defendants have caused harm to Class members residing in this District, as explained below. Ford has marketed, sold, and leased the Class Vehicles, and Defendants otherwise conducted extensive business, within this District. Thousands of Class members purchased their Class Vehicles from the multiple Ford dealers located in this District.

## IV.     INTRADISTRICT ASSIGNMENT

54.     This action is properly assigned to the Oakland Division of this District pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the Oakland Division. Plaintiff Ivan Tellez and numerous Class members purchased and maintained their Class Vehicles in counties served by this Division. Moreover, Defendants conduct substantial business in the counties served by this Division, Ford has marketed and sold or leased the Class Vehicles in those counties, and has caused harm to Class members residing in those counties.

## V.     FACTS COMMON TO ALL COUNTS

55.     Defendants intentionally designed, marketed, and sold trucks in a manner intended to mislead consumers and regulators about the amount of pollution the trucks created and the fuel efficiency and performance qualities they possessed.

56.     Ford has consistently marketed the F-Series "Super Duty" trucks to consumers looking for excellent performance, measured for heavy-duty trucks in terms of torque, horsepower, and towing capacity. But these trucks are also notoriously fuel inefficient. And as regulators have imposed stricter standards on automakers, Ford, like other automakers, has found itself at a crossroads: how can heavy-duty vehicles provide the same performance at a fraction of the emission levels they historically produce *and* improve fuel economy?

57.     U.S. consumers are becoming all too familiar with automakers cutting corners in order to meet customer expectations while still getting their vehicles certified for sale by environmental regulators. Volkswagen's scheme was the first to come to light, and others have followed in rapid succession. Ford cut the same corners in developing its new diesel engine, with Bosch's help. Despite touting the Power Stroke-equipped trucks as emissions compliant and fuel-efficient while being powerful as ever, Ford sold expensive trucks that produced pollution at magnitudes above federal and state regulations, and then intentionally and knowingly hid this truth.

A.     **History of the F-Series Trucks**

58.     The "Built Ford Tough F-Series" brand is well known, having "reign[ed] as America's best-selling trucks for [over] 40 straight years and best-selling vehicles for 35 straight years[.]" Ford has sold more than 26 million F-Series trucks in the United States since 1977. The F-Series has also enjoyed international success. In 2014, it was reported that an F-series truck was sold every 42 seconds around the globe.

59.     Ford introduced the F-150 pickup in 1975, which spawned the "Built Ford Tough" brand. Then, in 1998, Ford introduced the F-Series Super Duty. The Super Duty trucks are "[e]ngineered for fleet and heavy-duty work use."

60.     Ford F-Series Super Duty trucks are for "those within the toughest industries" and for the "people who do the work." *Consumer Reports* states that "[t]he big Ford F-250 has always been about handling heavy loads and tough jobs." Put simply, the Super Duty trucks are known for their performance and power.

61.     The Super Duty trucks, given the demanding uses they are put to and their sheer size, have not historically been particularly fuel-efficient. Using diesel engines in these trucks is a good solution to fuel efficiency challenges because in sophisticated engines like the 6.7-liter Power Stroke, diesel fuel can provide as much power as gasoline while also offering better fuel efficiency.

**B.      The Unique Power Offered by Diesel Engines Comes at a High Cost for the Environment**

62.     Consumers seek out diesel engines over gasoline engines primarily for the advantages gained by the combination of fuel economy and power, especially as measured by torque. Torque, in general terms, is what determines how heavy a load a vehicle can haul or tow, an especially relevant consideration for heavy-duty trucks like the Class Vehicles.

63.     Diesel engines are more fuel-efficient than gasoline engines because they operate at a higher compression ratio than gasoline engines. As a result, diesel fuel has approximately 10 percent more energy by volume than gasoline. According to Ford, modern diesel engines consume 25-30 percent less fuel by volume (15-20 percent less by energy) than comparable gasoline engines and, on a well-to-well (WTW) basis, emit up to 20 percent less $CO_2$ per kilometer.

64.     These advantages come at a cost: high emissions of particulates and oxides of nitrogen. Particulates contribute directly to soot accumulation, smog, and acid rain, and comprise the disgusting clouds of blue-black smoke that past generations associated with diesel engines. Meanwhile, $NO_X$ is a hazardous pollutant and "an indirect greenhouse gas" that contributes to the formation of ground-level ozone, a greenhouse gas, and can travel hundreds of miles from the source of emission. Ozone is a colorless and odorless gas that, even at low levels, can cause cardiovascular and respiratory health problems, including chest pain, coughing, throat irritation, and congestion. The human health concerns from overexposure to $NO_X$ are well established, and include negative effects on the respiratory system, damage to lung tissue, and premature death. $NO_X$ can penetrate deeply into sensitive parts of the lungs and is known to cause or worsen respiratory diseases like asthma, emphysema, and bronchitis, as well as to aggravate existing heart disease. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are particularly susceptible to such adverse health effects. The impact of NOx is borne by all of society as increased public health costs and environmental harm.

65.     Ford acknowledges these health costs and environmental harm, noting that the company "plan[s] to comply" with EPA standards and that "Regulated smog-forming tailpipe emissions include hydrocarbons, nitrogen oxides (NOx), carbon monoxide and particulate matter. We recognize that these pollutants increase with vehicle congestion."

66.     Given these health and environmental risks, minimizing NOx and particulate emissions is important. But removing these pollutants from untreated exhaust is technically difficult. Diesel automakers use several technologies to burn, trap, or filter pollutants, or to convert them into other, harmless substances.

67.     Modern turbodiesel engines use a "Diesel Particulate Filter" ("DPF") to trap particulates before they are emitted. One approach to reducing NOx emissions is to use "traps" in the exhaust system containing certain metallic elements that attract NOx molecules to trap them in place, so that they can be burned off by running additional fuel through the engine and exhaust. Another approach is to use exhaust gas recirculation ("EGR") to recirculate exhaust containing NOx back through the engine's combustion chambers in order to burn off more NOx. DPF and NOx traps both require running additional fuel through the system periodically, reducing fuel economy. The additional fuel that will be unburned in combustion is controlled by the same engine computer that manages the fuel-air mixture and other aspects of engine operation. The same is true of EGR, which requires the computer to close and open a system of valves in the intake and EGR systems. A third method is to use a technology called "Selective Catalytic Reduction" ("SCR") to reduce NOx emissions. SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into less noxious substances before they are emitted. SCR-equipped vehicles must carry an onboard tank of Diesel Exhaust Fluid ("DEF") for this purpose. Much like DPF, EGR, and trap systems, SCR requires that injection of DEF be controlled by the same engine control programming.

**C.**  **Ford Introduced the 6.7-liter Power Stroke Diesel Engine in its 2011 F-250 and F-350 Super Duty Diesels to Address Stricter Environmental Regulations**

68.      In the face of increasingly stringent emissions and fuel economy standards to comply with as of 2010, Ford had to find a way to provide its customers with the same performance and reliability at a fraction of the truck's past fuel economy and emissions levels. Eager to penetrate the "clean diesel" market, Ford was willing to cut corners.

69.      Amidst these new regulations, Ford debuted its "Power Stroke" engine as part of its 2011 portfolio, at the same time other automakers also debuted their "clean diesel" engines. Significantly, the Power Stroke featured a Bosch common-rail injection system and SCR system to reduce harmful emissions, as well as Bosch supplied engine and emissions programming to control these systems. Ford promised that the Power Stroke engine could achieve best-in-class performance while being the "cleanest Super Duty diesel ever."

70.      Ford also explicitly stated in an August 2009 press release that the "new 6.7-liter Power Stroke V8 turbocharged diesel will employ an aftertreatment system *to help comply with 2010 federal regulations to reduce nitrogen-oxide levels in diesel emissions by more than 80 percent compared with the previous standard*."

71.      Ford prided itself on embracing this Clean Diesel technology, touting the development of the new Power Stroke engine in the 2009 press release, stating the new technology would "*deliver significant improvements in torque, horsepower and fuel economy while adding more fueling flexibility and easily meeting stringent new emissions requirements*." The company specifically emphasized NOx reduction technologies, noting the engine was designed to be run while "*Knocking out the NOx*" and to "*reduce NOx without degrading performance and fuel economy*" via DEF dosing in the SCR chamber.

72.      The 2011 Super Duty was marketed as offering the "best diesel and gas fuel economy of any truck in its class—plus lots of other capabilities and features only Ford [could] deliver":

73.     Adam Gryglak, the Power Stroke lead engineer, stated: "This is the most advanced Power Stroke yet with the cleanest emissions . . . and substantially improved power and fuel economy." In assuring customers that they could have it all, he said: "When we looked at the design imperatives of the program we were looking to ensure that we delivered improved performance, fuel economy, NVH and heat management with the aftertreatment system. The reverse flow and inboard exhaust configuration helps us achieve all of those objectives. It's a smarter design." He explained that the new turbo design "allows us to drive at very low airflow rates to meet the new NOx regulations but also allows us to build the boost we need to overcome the pressure from the EGR [exhaust gas recirculation]."

74.     Mark Fields, then Executive Vice President of Ford Motor Company and later CEO, said: "Our Super Duty customers do some of America's toughest jobs…. Every day they're out there working with little fanfare and all they ask is the right tool for the job. The new 2011 Super Duty offers them a truck with best-in-class towing and payload, all-new powertrains and even more capability than ever to help them do their jobs." Fields also noted that the engine "delivers

significantly improved torque and horsepower as well as class-leading fuel economy while

maintaining best-in-class towing and payload capability."

75.    To reduce particulate and NOx emissions, the new Power Stroke-equipped Super Duty

trucks used several technologies described in detail above: diesel particulate filters (DPF), exhaust gas

recirculation (EGR), and Bosch's "Denoxtronic" selective catalytic reduction (SCR) system. The

engines' efficiency, power, and purported cleanliness were facilitated by Bosch high-pressure

common-rail direct fuel injection and new engine and emissions control programming developed by

Ford and Bosch together.

**D.    Ford Intentionally Hid the Excessive and Illegal Levels of Pollution Emitted From Its Trucks**

76.    To introduce a new vehicle in the U.S. market, auto manufacturers must obtain a COC

from the EPA, by showing that the vehicle comports with the requirements of the CAA. In addition,

under California law, manufacturers must receive an EO from CARB.

77.    As part of COC certification process, the manufacturer must disclose any "auxiliary

emission control devices" ("AECDs") that are included in the vehicle. AECDs are "any element of

design which senses temperature, vehicle speed…or any other parameter for the purpose of activating,

modulating, delaying, or deactivating the operation of any part of the emission control system." 40

CFR 86.1803-01. All vehicles have AECDs. There is nothing *per se* illegal about modulating the

emissions control systems. However, in applying for a COC, the manufacturer must list all AECDs in

the vehicles, and then justify why they are not defeat devices. 40 CFR 86.1844-01(d)(11).

78.    As explained in 40 CFR 86.1803-01, "Defeat device means an auxiliary emission

control device (AECD) that reduces the effectiveness of the emission control system under conditions

which may reasonably be expected to be encountered in normal vehicle operation and use, unless:

(1) Such conditions are substantially included in the Federal emission test procedure;

(2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; or

(3) The AECD does not go beyond the requirements of engine starting."

79.     On information and belief, Ford failed to disclose the presence of certain AECDs in the Class Vehicles to cheat emissions tests, and in on-road testing, these AECDs function in a manner that appears to meet the "defeat device" definition.

## E.     Ford Claims That It Is Concerned With Reducing Harmful Emissions and Improving Fuel Economy

80.     Ford claims that through its "research and development activities [it] continuously pursue[s] innovative solutions for even cleaner and more efficient propulsion systems." And, "[t]hanks to technologies such as diesel oxidation catalysts, diesel particulate filters, selective catalytic reduction systems and lean nitrous oxide (NOx) traps, non-$CO_2$ emissions such as NOx and particulate matter have been greatly reduced relative to past models."

81.     "In North America, [Ford] offer[s] two advanced diesel engines: the 6.7L Power Stroke V8 available in [its] Super Duty and Medium Duty commercial trucks, and a new 3.2L Power Stroke turbo diesel in the Transit Van." Ford notes that "[d]iesel engines continue to be a popular option, due to their excellent drivability, $CO_2$ emissions, and fuel consumption characteristics when carrying heavy loads."

82.     In its "Plan for a More Sustainable Future," Ford claimed that "[f]or the past nine years, [it] ha[s] been following an ambitious plan of vehicle technology and alternative powertrain and fuel actions. By implementing this consistently, [it] [purports to be] improving fuel economy and reducing $CO_2$ emissions across [its] product portfolio."

83.     While installing software designed to cheat emissions testing, Ford encouraged consumers to "Reduce carbon footprint" and "Meet emissions standards" in their brochures, with the image below:

1
2
3
4
5
6
7
8
9
10
11
12



13
14

**F.      Defendants Promised Consumers That Their "Cleanest" Super Duty Diesel Trucks Could Achieve Fuel Efficiency and Emissions Compliance Without Sacrificing Performance**

15      84.     Ford represented that the Class Vehicles were compliant with federal emissions and fuel

16  economy requirements. Ford also represented that the Class Vehicles would be able to outperform

17  previous models while complying with these standards. What these representations fail to mention—

18  and what Ford failed to tell regulators and consumers—is the critical fact that the Power Stroke's

19  emissions system does not operate to these standards at all times and was programmed to allow the

20  engine to pollute at much higher levels in normal on-road conditions.

21      85.     In particular, Ford also represented that the Class Vehicles, while complying with

22  stricter fuel economy and emissions standards, could still outperform the competition. Adam Gryglak,

23  the Power Stroke lead engineer, said in a statement: "The new Power Stroke diesel enables class-

24  leading towing capability at faster speeds, all with best-in-class fuel economy."

25
26
27
28

86.     Ford also represented that the 2011 Super Duty line would average 18 percent better fuel economy on the pickups and 25 percent better on the chassis cabs compared with the outgoing model.

87.     Mark Fields, then Ford President for the Americas stated: "The whole intent of the team was that we come out with a diesel engine that is class-leading in all aspects—fuel economy, performance, capability." Doug Scott, Ford truck group marketing manager, shared Fields' sentiments: "Our statement is that we are going to continue to be best-in-class with respect to towing and payload, and we expect best-in-class on fuel efficiency."

88.     Moreover, while knowing that the Class Vehicles could only meet consumer expectations of performance at illegally high emissions levels, Ford nevertheless sold and continues to sell Class Vehicles as if they are able to accomplish lower emissions, best-in-class performance, ***and*** improved fuel economy, all at once.

89.     Despite Defendants' knowledge that the Class Vehicles emitted high levels of pollution on the road, Ford marketed the trucks as having lower emissions than ever before. Using the images below, Ford promised that the 6.7-liter Power Stoke diesel engine would deliver on the trifecta: best fuel economy, power, and torque.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23

90.    Ford also marketed the Class Vehicles as the "cleanest Super Duty diesel ever":

24
25
26
27
28



91.    But Ford failed to mention that its promises of advanced performance with reduced fuel consumption and lower emissions were only achievable through cheating.

**G.    Defendants' Dirty "Defeat Device" Scheme**

92.    Federal and state emission standards are in place to protect Americans from pollution and certain chemicals known to cause disease in humans. Automobile manufacturers must abide by

applicable laws and adhere to EPA rules and regulations. The CAA requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emission standards to control air pollution. Every vehicle sold in the United States must be covered by an EPA-issued COC. Likewise, every vehicle sold in California—and in several other states that have adopted California's standards—must be covered by a CARB-issued EO.

**H.      Laboratory and Road Testing**

93.     Plaintiffs' counsel retained experts from the Center for Alternative Fuels, Engines, and Emissions at West Virginia University to test and analyze the emissions produced by the Class Vehicles. These experts conducted extensive testing both inside on a four-wheel chassis dynamometer and on the open road with a portable emissions measurement system ("PEMS"). The testing confirmed that during on-road operations, the Class Vehicles produce substantially higher levels of NOx than when being tested on the dynamometer. Real-world NOx emissions for the Class Vehicles are egregiously above legal limits.

94.     Plaintiffs' experts conducted laboratory and road testing of two 6.7-liter Power Stroke V8 Super Duty Diesel trucks: a 2013 F-350 and a 2017 F-350. Both trucks had been recently serviced and were in good working order with no fault codes indicating any problems with the vehicles.

95.     Both vehicles were tested over standard federal test cycles in the laboratory on a four-wheel chassis dynamometer.



**2017 Ford F350 during dynamometer testing**

96.     Both test vehicles were also tested on the road using a PEMS over two different repeatable test routes: the first involving a mix of urban, suburban and highway driving, and the second predominantly highway driving.

97.     Additionally, the 2013 F-350 test vehicle was driven cross-country from California to Florida with micro-PEMS sensor-based data logging of nearly 2,600 miles of operations. Plaintiffs' experts estimated emissions results for this vehicle's travel through five states (California, Arizona, New Mexico, Texas, and Louisiana).

98.     All this testing revealed that the two Ford Super Duty Diesel F-350s, which are representative of all the 2011-2018 Class Vehicles, emit much higher levels of NOx on the road than on the dynamometer in the laboratory. This pattern indicates that the vehicles' software distinguishes between dynamometer operation and on-road driving—that the vehicle "knows" whether it is being tested—and that the software contains illegal defeat devices that minimize emissions scrubbing when the vehicle is not being tested.

99.     In real-world road driving, especially in cooler temperatures and under load, the Ford F-350 test vehicles emitted NOx at levels many multiples above the legal limits to which they were certified.

### 1.     2013 F-350 Testing

100.    The 2013 Ford F-350 was certified under federal heavy-duty vehicle 1 (HDV1) standards and California medium duty vehicle 6 (MDV6) standards at 0.2 g/mile (0.124 g/km) of NOx emissions during the federal test protocol 75 (FTP-75) test procedure, which generally represents stop-and-go conditions coupled with some higher speed operations. These standards were applied for comparisons to real-world PEMS testing results collected over the on-road test route that included urban, suburban, and some highway driving.

101.    The 2013 Ford F-350 was certified under federal HDV1 standards and California MDV6 standards at 0.4 g/mile (0.249 g/km) of NOx emissions during the highway fuel economy test procedure (HWFET), which represents highway driving. These standards were compared with PEMS testing results collected over the real-world test route comprised primarily of highway driving.

102.    In two separate lab dynamometer tests following the FTP-75 drive cycle, the 2013 F-350 test vehicle emitted NOx at levels of 0.288 g/km and 0.336 g/km, which exceeded the FTP-75 certification standard of 0.124 g/km.

103.    On the road, the NOx emissions were markedly higher than in the test cell. The 2013 vehicle was PEMS tested three times over the mixed urban/suburban/highway route, and NOx emissions were measured at 3.698 g/km, 3.878 g/km, and 3.759 g/km. Expressed as a ratio of measured emissions compared to federal and California limits ("Deviation Ratio"), the 2013 test truck produced NOx at levels 29.8, 31.2 and 30.3 times the FTP-75 limit. The vehicle was also tested three times with PEMS monitoring over the highway route, where the NOx emissions were 15.6, 15.4 and 13.7 times the federal HWFET limits. Because the PEMS testing on the 2013 F-350 was conducted in

temperatures ranging from -6.3 degrees C to -9.2 degrees C, the results would indicate a defeat device that throttles back on the vehicle's emissions reduction system at lower ambient temperatures.



**2013 Ford F350 with trailer on scale**

    2.    **2017 F-350 Testing**

    104.   The 2017 Ford F-350 was certified under federal heavy-duty vehicle 2 (HDV2) standards and California medium duty vehicle 7 (MDV7) standards at 0.4 g/mile (0.249 g/km) of NOx emissions during the CVS-75 test procedure. This standard applies to the federal test protocol 75 (FTP-75) test procedure, which generally represents stop-and-go conditions coupled with some higher speed operations. These standards were applied for comparisons to real-world PEMS testing results collected over the on-road test route that included urban, suburban, and some highway driving.

    105.   The 2013 Ford F-350 was certified under federal HDV2 standards and California MDV7 standards at 0.8 g/mile (0.249 g/km) of NOx emissions during the highway fuel economy test procedure (HWFET), which represents highway driving. These standards were compared with PEMS testing results collected over the real-world test route comprised primarily of highway driving.

106.   On the chassis dynamometer over the FTP-75 standard federal test cycle, the 2017 F-350 test vehicle emitted NOx at levels of 0.097 g/km (at the simulated weight of 9000 pounds) and 0.112 g/km (at a simulated weight of 11,000 pounds representing a payload). These NOx values were less than half of the 0.249 g/km limit under federal and California regulations. They were remarkably close to Ford's reported NOx emissions rate of .104 g/km for the 2017 F-350 diesels over the FTP-75 cycle.

107.   When tested in the lab over the standard federal highway driving cycle (HWFET), the 2017 Ford diesel test vehicle performed even better, with NOx emissions of only .001 g/km (at 9000 pounds) and .004 g/km (at 11,000 pounds). These compare closely to Ford's own reported NOx emissions on the 2017 model, which were 0.005 g/km, and are well below the federal and California standard of 0.497 g/km. In summary, the 2017 Ford F-350 Super Duty Diesel performed exceedingly well during laboratory testing on the dynamometer—far below federal and California emissions limits.

108.   Outside of the laboratory, however, the 2017 F-350 diesel test vehicle could not duplicate its stellar NOx emissions performance. PEMS testing on the road recorded NOx emissions that were multiples higher than the allowable standards, especially at lower temperatures and under load. In five test runs over the mixed urban/suburban/highway route representative of FTP-75 style driving, the unloaded 2017 F-350 emitted NOx at rates of 3.066 g/km, 2.060 g/km, and 2.324 g/km (Deviation Ratios of 12.3, 8.3, and 9.3 times the federal limit) when operating at temperatures near freezing, and at 1.220 g/km and 1.159 g/km (Deviation Ratios of 4.9 and 4.7 times the limit) at moderate temperatures when loaded to a combined weight of 16,200 pounds.

109.   Over the highway route, the unloaded test vehicle produced NOx emissions of 3.024 g/km, 3.930 g/km, and 4.013 g/km (Deviation Ratios of 6.1, 7.9, and 8.1 times the more generous federal HWFET certification standard for this vehicle in colder temperatures (-3.0 to -3.4 degrees C).

In more normal temperatures and at a combined weight of 16,200 pounds, the loaded 2017 test vehicle emitted 2.626 g/km and 2.711 g/km, or 5.3 and 5.5 times the HWFET standard in highway route testing. All the measured NOx emissions in real-world highway driving were orders of magnitude higher than in the laboratory, where NOx emissions averaged an impressive 0.0025 g/km. For instance, the lowest measured average NOx value at low temperatures on the road highway route (3.024 g/km) is 1210 times higher than the average measured emissions for HWFET-cycle dynamometer testing. **This is unmistakable evidence of engine control software capable of (1) recognizing the test dynamometer and (2) defeating the vehicle's emissions technology when not on the dynamometer.**

110.    It bears noting that expressing the noncompliance of the 2017 F-350 test vehicle in terms of its Deviation Ratio understates the level of noncompliance in absolute terms because the 2017 Super Diesels were certified as Class 2 heavy-duty vehicles and therefore had NOx emissions limits that were twice as high as in previous years. Had Ford not changed its certification classification for the 2017 vehicles, the Deviation Ratios for the 2017 F-350s emissions would have been twice as high and in the range of the 2013 test vehicle. Another way to examine the 2017 test vehicle emissions would be to compare real-world to lab results. The 2017's emissions were far lower in the lab than the 2013 test vehicle. For instance, the 2013 test vehicle averaged 0.312 g/km NOx for two separate FTP-75 test cycles, whereas the 2017 test vehicle averaged only 0.105 g/km NOx—just about one-third as much as the 2013. Therefore, if on-road results were expressed in multiples over laboratory results, the 2017 vehicle would show even higher multiples than the 2013 vehicles. This indicates that the defeat devices in the 2017 vehicles were working in similar fashion to those in the 2013 vehicles, at least at colder ambient temperatures as the 2013 vehicle was PEMS tested over defined routes only at colder temperatures. (As discussed in the next section, the 2013 vehicle was

also road tested extensively at moderate temperatures in cross-country driving from California to Florida.)

### 3.      Cross-Country Testing

111.    In addition to PEMS monitoring over two defined test routes, the 2013 Ford F-350 Super Duty Diesel was driven cross-country from California to Florida with both portable emissions and activity monitoring. The activity monitoring utilized the vehicles onboard diagnostic broadcast system and a portable activity monitoring system configured by the testers that recorded data such as speed, location, and ambient temperature. NOx emissions were estimated through micro-PEMS logging based on two sensors:  the on-board NOx sensor along with an independent Continental UniNOx sensor that was installed in the vehicle's tailpipe. The portable activity monitoring system was linked with global positioning so that NOx emissions could be separated state by state for the cross-country travel, as follows: (1) in California, estimated NOx emissions were 6.733 g/mile, or a Deviation Ratio of 16.8 times the federal HWFET standard for the 2013 F-350 Diesel; (2) in Arizona, estimated NOx emissions of 6.352 g/mile translating to a Deviation Ratio of 15.9 times the same federal standard; (3) in New Mexico, NOx emissions at a 15.9 multiple of the HWFET standard; (4) in Texas, a Deviation Ratio of 12.7 times the applicable standard; and (5) in Louisiana, where the estimated average NOx emissions of 8.955 g/mile are a whopping 22.4 times the federal HWFET standard for hundreds of miles across the state.



**Tailpipe NOx mass emission results in California**

112.    For reference, the average ambient temperatures logged into the 2013 F-350 test

vehicle's portable activity monitoring system for the five different states was 9.1 C for California,

12.5 C for Arizona, 12.7 C for New Mexico, 13.4 C for Texas, and 19.4 C for Louisiana. Converted to

Fahrenheit, this covers a range from 48 F to 67 F, which are certainly not extreme temperatures. The

2013 F-350 had a trailer in tow weighing about 11,500 pounds, so there was added load on the engine

that might be expected to produce moderately elevated emissions—but not nearly to the extent

observed. These findings show unequivocally that, contrary to Ford's claims, its diesel trucks are

unhealthy and unlawful.

**I.      Bosch and Ford Conspired To Develop and Implement the Emissions Technology in the Class Vehicles**

113.    As described above, Bosch's engine and emissions control programming directly affects

emissions in the Class Vehicles, and varies emissions between test conditions and normal operation. It

does so by periodically reading sensor values, evaluating a control function, and controlling actuators

based on the control signal.[8] Sensor readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear. Based on sensor input, the software controls and influences the fuel combustion process—in particular fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.[9]

114.   A recently published 17-page long-form article by the German weekly investigative news magazine *Der Spiegel* details the central role Bosch has played in the diesel scandal. The article reports that prosecutors in Germany are investigating Bosch for providing and programming illegal software for use in Ford vehicles.

115.   In the Class Vehicles, Defendants enabled the software to surreptitiously evade emission regulations. Bosch and Ford worked together to develop and implement a specific set of software algorithms for implementation in the Class Vehicles, which enabled Ford to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates.

116.   This is illegal, and it is also misleading to both regulators and consumers. The Clean Air Act expressly prohibits defeat devices, defined as any auxiliary emissions control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the Clean Air Act prohibits the sale of components used as defeat devices "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42

---

[8] Moritz Contag et al., *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles*, p.4 (2017).
[9] *Id.*

U.S.C. § 7522(a)(3). Finally, in order to obtain a certificate of compliance ("COC"), automakers must submit an application listing all auxiliary emissions control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

117.   Thus, in order to obtain the COCs necessary to sell the Class Vehicles, Ford did not disclose, and affirmatively concealed, the presence of the performance-altering software code that it developed with Bosch from government regulators, thus making that software an illegal defeat device. In other words, Ford lied to the government, its customers, its dealers, and the public at large.

118.   Because the COCs were fraudulently obtained, and because the Class Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Class Vehicles were never covered by a valid COC, and thus were never legal for sale, nor were they EPA and/or CARB compliant, as represented. Ford and Bosch hid these facts from the EPA, CARB and other regulators, its dealers, and consumers, and it continued to sell and lease the Class Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

119.   Bosch was well aware that Ford was using its emissions control components as a defeat device and, in fact, worked with Ford to develop the software algorithm specifically tailored for the Class Vehicles.

**J.    Defendants Profited Handsomely from the Class Vehicles**

120.   Defendants charge and consumers pay substantial premiums for the Class Vehicles. For example, according to publications, the 2017 Ford F-250 and F-350 come standard with a 6.2-liter V-8 gasoline engine, but the 6.7-liter turbo-diesel Power Stroke V-8 is available at an $8,595 ($9,120 for 2018 MY) premium. The premiums occur across every year in which Defendants installed its "defeat device" for emissions testing in the Class Vehicles.

**K.      The Defendants' Actions Caused Class Members Significant Harm**

121.    Ford will not be able to make the Class Vehicles comply with emission standards without substantially degrading their performance characteristics, including their horsepower and efficiency. As a result, while Ford may be able to repair the Class Vehicles to bring them in compliance with emissions standards, a repair alone will not compensate Plaintiffs and the class for the significant harm Defendants' deception has caused.

122.    First, any repairs will diminish the performance of the Class Vehicles. Ford will likely not be able to make those vehicles compliant with state and federal regulations without degrading performance, fuel efficiency, or both. That is because any solution will likely involve reprogramming the Class Vehicles' software to engage the emissions control equipment at all times in a manner that reduces engine power and fuel economy to bring NOx emissions within legal limits. As a result, even if Ford is able to make the Class Vehicles EPA-compliant, Plaintiffs and Class members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased.

123.    Second, a repair cannot compensate for the financial damages Plaintiffs and Class members have suffered, including the premium Plaintiffs and the Class paid to own or lease their vehicles, the inevitable reduction in resale value caused by the defeat device, and the increase in fuel expenses as the vehicles become less efficient following reprogramming.

124.    The resale values of Plaintiffs' and Class members' vehicles are likely to drop, similar to what happened after the discovery of emission defeat devices in certain Volkswagen vehicles. For example, Kelley Blue Book ("KBB"), www.kbb.com, is known as the nationwide "go-to" pricing guide for used vehicles. KBB has an established vehicular valuation methodology and its values are broadly accepted in the industry by both buyers and sellers of used vehicles. Information from KBB

showed that price quotes for Volkswagen vehicles dropped nearly $1,000 in less than a week after the EPA issued a Notice of Violation to Volkswagen.

125.   For those reasons, as a result of Defendants' unfair, deceptive, and/or fraudulent business practices, and their failure to disclose that under certain operating conditions the Class Vehicles emit many times the allowed levels of NOx, owners and/or lessees of the Class Vehicles have suffered losses in money and/or property.

126.   Had Plaintiffs and Class members known of the "defeat device" at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

127.   In sum, Ford's deliberate strategy to value profit over the truth, human health, and the environment, has caused serious harm to consumers nationwide.

## VI.   CLASS ACTION ALLEGATIONS

128.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities in the United States who are current or former owners and/or lessees of a "Class Vehicle." Class Vehicles include, without limitation: 2011–2018 F-250, F-350, or F-450 Super Duty trucks equipped with 6.7-liter Power Stroke diesel engines.

129.   The phrase "persons or entities" as used in this Complaint and the Class definitions, includes, but is not limited to, independent (non-Ford franchise) automobile dealers in the United States (including its territories and the District of Columbia) with one or more previously-owned Class Vehicles in their inventory on the date this Complaint is filed.

130.   Excluded from the Class are individuals who have personal injury claims resulting from the conduct alleged herein. Also excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental

entities; and the Judge to whom this case is assigned and his immediate family. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery.

131.   Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

132.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

133.   Plaintiffs reserve the right to modify the definition of the Class prior to class certification.

## 1.      Numerosity: Federal Rule of Civil Procedure 23(a)(1)

134.   The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are not less than hundreds of thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but it may be ascertained from Ford's records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

## 2.      Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

135.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)      Whether Defendants engaged in the conduct alleged herein;

(b)      Whether Defendants designed, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

(c)     Whether the emissions control systems in the Class Vehicles contain a defect in that it does not comply with EPA requirements;

(d)     Whether the emissions control systems in Class Vehicles can be made to comply with EPA standards at all times without substantially degrading the performance and/or efficiency of the Class Vehicles;

(e)     Whether Defendants knew about the "defeat device" and, if so, how long Defendants have known;

(f)     Whether Defendants had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class members;

(g)     Whether Defendants omitted, concealed, and/or failed to disclose material facts about the Class Vehicles;

(h)     Whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with a "defeat device;"

(i)     Whether Defendants' concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to his or her detriment by purchasing and/or leasing the Class Vehicles;

(j)     Whether Defendant Bosch designed and manufactured the emissions-cheating software present in the Class Vehicles;

(k)     Whether Bosch supplied the emissions-cheating software to Ford with the knowledge that Ford would use it in production of the Class Vehicles;

(l)     Whether Bosch acted in concert with Ford and aided and abetted Ford's fraud;

(m)     Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

(n)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount;

(o)      Whether Plaintiffs and the other Class members overpaid for their Class Vehicles; and

(p)      Whether Defendants continue to unlawfully conceal whether additional vehicles are in fact Class Vehicles.

### 3.      Typicality: Federal Rule of Civil Procedure 23(a)(3)

136.    Plaintiff claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class Member purchased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Neither Plaintiffs nor the other Class members would have purchased the Class Vehicles had they known of the defects in the vehicles. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

### 4.      Adequacy: Federal Rule of Civil Procedure 23(a)(4)

137.    Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

5.      **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**

138.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

6.      **Superiority: Federal Rule of Civil Procedure 23(b)(3)**

139.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

140.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.    Discovery Rule Tolling

141.    The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

142.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Ford was

concealing and misrepresenting the true emissions levels of its vehicles, including but not limited to its use of defeat devices.

143.   Plaintiffs and the other Class members could not reasonably discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within its knowledge to federal and state authorities, its dealerships, or consumers.

144.   Likewise, a reasonable and diligent investigation could not have disclosed that Ford had information in its sole possession about the existence of its sophisticated emissions deception and that it concealed that information, which was only discovered by Plaintiffs immediately before this action was filed.

**B.     Tolling Due to Fraudulent Concealment**

145.   Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

146.   Upon information and belief, prior to the date of this Complaint, if not earlier, Defendants knew of the defeat device in the Class Vehicles, but continued to distribute, sell, and/or lease the Class Vehicles to Plaintiffs and the class members. In doing so, Defendants concealed and expressly denied the existence of problem with $NO_X$ emissions, and/or failed to notify Plaintiffs and the Class members about the true nature of the Class Vehicles.

147.   Instead of disclosing its deception, or that the emissions from the Class Vehicles were far worse than represented, Defendants falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

C.      Estoppel

148.    Defendants have a continuous and on-going duty to tell the truth about their products and to disclose to Plaintiffs and the other Class members the facts that they knew about the emissions from Class Vehicles, and of those vehicles' failure to comply with federal and state laws.

149.    Although they had a duty throughout the relevant period to disclose to Plaintiffs and Class members that they had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Class Vehicles, and intentionally misrepresented their blatant and deceptive lack of compliance with state law regulating vehicle emissions and clean air.

150.    Defendants actively concealed the true character, quality, performance, and nature of the defeat device in the Class Vehicles, and Plaintiffs and the class members reasonably relied upon Defendants' knowing and active concealment of these facts.

151.    Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VIII.   CAUSES OF ACTION

### COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
### (18 U.S.C. §§ 1961, *et seq.*)

152.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

153.    Plaintiffs bring this Count on behalf of the Class against Ford Motor Company, Hackett, Fields, Bosch GmbH, Bosch LLC, and Denner (inclusively, for purposes of this Count, Defendants are referred to as "RICO Defendants"). As described above, the Bosch Group conducts its business,

both legitimate and illegitimate, through hundreds of companies, subsidiaries, and affiliates, including Bosch GmbH and Bosch LLC.[10]

154.   At all relevant times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

155.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate" § 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

156.   The RICO Defendants sought to maintain and increase the high volume of Class Vehicle sales and protect the profits derived therefrom. F-Series sales are an important revenue driver, as a stable and popular "bread and butter" sector of Ford's vehicle production.[11] As a Chief Financial Officer and Executive Vice President for Ford explained, the "Super Duty" F-Series line is "very, very important" contributor to Ford's revenue due to its "high volume" and "high margins" that are "amongst the best in the portfolio." As such, F-Series vehicle sales—including the F-250, F-350, and F-450—play a critical role in stabilizing Ford's bottom line, as one of Ford's "precious franchises" insulating its portfolio from volatility. This stable cash flow is of increasingly critical importance to Ford as it looks forward and ventures into more competitive and less predictable "emerging opportunities" including electric and autonomous vehicles. On an October 26, 2017 earnings call, CEO Hackett noted that "Super Duty is doing extremely well," and the company "had counted on that."

---

[10] *See generally* https://www.bosch.com/bosch-group/ (last accessed on March 13, 2018).
[11] Aaron Brzozowksi, *The F-Series is Posed To Be Ford's Bread and Butter For Some Time to Come*, Ford Authority (Nov. 21, 2017), http://fordauthority.com/2017/11/the-f-series-is-poised-to-be-fords-bread-and-butter-for-some-time-to-come/.

157.   To keep its "precious" franchise viable in a competitive market, and facing increasingly stringent U.S. emissions standards, Ford was unable or unwilling to compromise on Class Vehicle performance in order to comply with the constraints of the law. And so, like Volkswagen, Fiat Chrysler, and others, Ford worked around it. Specifically, to maintain and increase revenue from the Class Vehicles, Ford conspired with Bosch GmbH and Bosch LLC to install customized emission treatment software in the Power Stroke diesel engine so that the Class Vehicles could "pass" the EPA and CARB testing. The software disabled or restricted certain of the emissions controls during real-world driving conditions, however, causing the Class Vehicles to spew up to 30 times the legal limits of NOx. Ford, with assistance from Bosch, concealed these software controls from regulators on COC and EO applications for the Class Vehicles, thus deceiving the EPA and CARB into approving the Class Vehicles for sale throughout the United States and California.

158.   To accomplish their fraudulent scheme and effectuate their common purpose, the RICO Defendants, along with others, had to work together to conceal the truth. Each Defendant was employed by or associated with, and conducted or participated in the affairs of, the RICO Enterprise defined below and referred to collectively as the "Super Duty Diesel RICO Enterprise" or "SDD Enterprise."

### 1.      Description of the SDD Enterprise

159.   At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, calibration, manufacture, testing, marketing, and sale of the Class Vehicles or the emissions controls therein, operated an association-in-fact enterprise through which the Defendants conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4), described in further detail below.

160.   The SDD Enterprise came together for the common purpose of deceiving regulators into believing that the Class Vehicles were eligible for coverage by a COC and/or EO and compliant with

emission standards. Their motivation was simple: to increase Defendants' revenues and profits and minimize their losses from the design, manufacture, distribution, and sale of the Class Vehicles and their component parts. As a direct and proximate result of their fraudulent scheme and common course of conduct, the RICO Defendants were able to extract millions of dollars from consumers. As explained below, their years-long misconduct violated §§ 1962(c) and (d).

161.   At all relevant times, the SDD Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in RICO Defendants' unlawful profit-making scheme.

162.   The SDD Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, and sale or lease of the Class Vehicles throughout the country, and the receipt of monies from the sale of the same.

163.   The association-in-fact SDD Enterprise consisted of at least the following entities and individuals, and likely others.

### a.     The Ford Defendants

164.   The Ford Motor Company ("Ford") is one of the "Big Three" U.S. automobile manufacturers and is the fifth largest automaker in the world based on total annual vehicle sales. Ford is headquartered in Dearborn, Michigan, and listed on the New York Stock Exchange under the Symbol "F." Defendant Jim Hackett has been at Ford's helm since May 22, 2017. Prior to that and dating back to July 1, 2014, Defendant Mark Fields was President and CEO of Ford. From 2012 until that appointment, Fields was Chief Operating Officer of Ford.

165.   Ford designed, engineered, and built the 6.7-liter Power Stroke diesel engine used in the Class Vehicles.

166.   Working with other members of SDD Enterprise, Ford conspired to install and conceal emissions control software in the Power Stroke diesel engines to provide the torque and power that are important features of the brand, while illegally circumventing stringent U.S. emission standards. Employing this cheating technology, Ford fraudulently obtained COCs and EOs for the Class Vehicles even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions, and especially so under increased payload. Exacerbating the problem, the Class Vehicles are routinely purchased and used to haul or tow heavy payloads, and are designed and marketed for this type of use. Further, Ford concealed this material information from regulators and consumers alike.

167.   Given its critical role in the development and installation of the defeat devices in the Class Vehicles, it is clear that Ford knew or recklessly disregarded that the Class Vehicles were unable to (and did not) comply with U.S. emission standards and yet concealed this information from regulators.

### b.   The Bosch Defendants

168.   As explained above, as part of the Defendants' scheme, the Bosch Defendants supplied the emissions control technology installed in the Class Vehicles. Bosch GmbH is a multinational engineering and electronics company headquartered in Germany, which has hundreds of subsidiaries and companies, including in the United States. It wholly owns Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan. Bosch also operates its Research and Technology Center of North America in Palo Alto, California.

169.   Bosch's divisions are grouped by subject matter, not location. Mobility Solutions is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of both Bosch GmbH and Bosch LLC. These individuals were responsible for the design, manufacture, development, customization, and supply of the EDC units for the Class Vehicles.

170.   Defendant Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the software installed in the Class Vehicles. Denner fostered Bosch's relationship with key corporate partners, such as Ford, which brought in millions of dollars in annual revenue for Bosch.

171.   Bosch worked with Ford to develop and implement a specific and unique set of software algorithms to surreptitiously evade emission regulations by deactivating certain controls under real-world driving conditions. Bosch was well aware that its engine and emissions parts and software would be used for this purpose, due in part to its similar conduct with respect to Volkswagen, Fiat Chrysler, and other manufacturers. Bosch was also critical to the concealment of these software functions in communications with regulators.

172.   Because the Bosch Defendants often refer to themselves as a group (*i.e.*, "Bosch" rather than "Bosch GmbH" and "Bosch LLC"), Plaintiffs cannot fully know the extent of each individual corporate entity's involvement in the wrongdoing prior to having access to discovery.

### c.   Structure of the Association-in-Fact Enterprise

173.   The SDD Enterprise formed as early as 2008 when Ford and Bosch began to work together to develop the Power Stroke engine and the emissions cheating scheme that was deployed in the Class Vehicles (beginning in late 2010 for the 2011 model year). On information and belief, Ford and Bosch entered into agreements to develop, install, and calibrate these systems in hundreds of thousands of Class Vehicles sold in the United States. Both supplier and manufacturer had to continuously cooperate to develop and install the cheating devices in the Class Vehicles.

174.   At all relevant times, the SDD Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of

legal entities, including Ford, its network of dealerships, its CEOs Hackett or Fields, Bosch GmbH, Bosch LLC, Denner, and other entities and individuals.

175.   Further, each participant in the SDD Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

176.   Within the SDD Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

177.   Further, the RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

178.   The RICO Defendants participated in the operation and management of the SDD Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the SDD Enterprise, they have a separate existence from it, including distinct legal statuses, offices, roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

179.   As a member of the SDD Enterprise, Ford designed, marketed, manufactured and sold the Class Vehicles throughout the United States. Ford, in conjunction with Bosch, also submitted the applications for COCs and EOs required for the Class Vehicles to be legally sold.

180.   Ford, Hackett, and Fields exerted substantial control over the SDD Enterprise, and participated in the affairs of the Enterprise, by, among other things:

A.     designing the Class Vehicles in conjunction with the Bosch Defendants, including the Power Stroke diesel engine with undisclosed AECDs;

B.     installing emissions control software that deactivates or restricts one or more of the controls during real-world driving conditions;

C.     concealing these software functions from regulators;

D.     manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

E.     misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

F.     introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

G.     concealing the existence of the emissions controls and the unlawfully high emissions from regulators and the public;

H.     misleading government regulators as to the nature of the emissions control technology and the defects in the Class Vehicles;

I.     misleading the driving public as to the nature of the emissions control technology and the defects in the Class Vehicles;

J.     designing and distributing marketing materials that misrepresented and/or concealed the defect in the vehicles;

K.     otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

L.     illegally selling and/or distributing the Class Vehicles;

M.     collecting revenues and profits from the sale of such products; and/or

N.    ensuring that the other RICO Defendants and unnamed co-conspirators complied with the scheme or common course of conduct.

181.   Bosch GmbH, Bosch LLC, and Denner also participated in, operated, and/or directed the SDD Enterprise. Specifically, Bosch GmbH and Bosch LLC participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying essential engine and emissions parts for the Class Vehicles, and the software or firmware to control them in furtherance of the emissions cheating scheme. Bosch GmbH and Bosch LLC exercised tight control over developing and writing software code customized for the Class Vehicles, and closely collaborated with Ford to develop, customize, and calibrate the software for the Class Vehicles. Additionally, Bosch GmbH and Bosch LLC continuously cooperated with the other RICO Defendants to ensure that Bosch engine and emissions parts, and programming to control them, were fully integrated into the Class Vehicles. This was a complex process that required years to complete.

182.   Bosch GmbH and Bosch LLC also participated in the affairs of the Enterprise by concealing the software functions from U.S. regulators in order to allow them to "pass" emissions testing, and actively lobbying regulators on behalf of "clean diesel." Bosch collected millions of dollars in revenues and profits from the hidden software installed in the Class Vehicles.

183.   Without the RICO Defendants' willing participation, including Bosch GmbH and Bosch LLC's active involvement in developing and supplying the critical emissions control software for the Class Vehicles designed to disable or restrict certain emissions controls during real-world driving conditions, the Enterprise's scheme and common course of conduct would not have been successful.

**2.    The Common Purpose: Unlawfully Increasing Profits and Revenues**

184.   The SDD Enterprise came together to design, calibrate, manufacture, distribute, test, market, and sell the Class Vehicles to consumers in the Class through obtaining fraudulent COCs and EOs. The Enterprise used false emissions tests and false or misleading sales tactics and materials to

derive profits and revenues from those activities. Each member of the Enterprise shared in the bounty it generated, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Class members nationwide. Ford sold more Class Vehicles and was able to charge consumers a premium price by marketing the Class Vehicles as having "best-in-class" fuel economy while also being the "[c]leanest Super Duty diesel ever." As a result, Bosch sold more EDC Units to equip the Class Vehicles, and derived increased revenues therefrom.

185.   To effectuate this scheme, the RICO Defendants formed the SDD Enterprise to fraudulently obtain COCs from the EPA (and EOs from CARB) in order to sell the Class Vehicles throughout the United States (and California), and through which enterprise they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

186.   The SDD Enterprise functioned by selling vehicles and their component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain concealed AECDs, or defeat devices. However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity through their fraudulent scheme to increase their collective revenue through sale of the Class Vehicles and concealing their true characteristics from regulators and consumers.

### 3.   Mail And Wire Fraud

187.   To carry out, or attempt to carry out, the scheme to defraud, the RICO Defendants—each of whom is a person associated-in-fact with the SDD Enterprise—did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

188.   Specifically, as alleged herein, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the SDD Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

189.   The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme to defraud consumers and regulators and increase their revenues through virtually uniform misrepresentations, concealments, and material omissions.

190.   In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and Class members or to obtain money from Plaintiffs and Class members by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

191.   The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

A.   <u>Mail Fraud</u>: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture,

market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

B.   <u>Wire Fraud</u>: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

192.   The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

A.   the Class Vehicles themselves;

B.   component parts for the 6.7-liter Power Stroke diesel engines;

C.   component parts for the Bosch emissions control hardware and software;

D.   false or misleading emission test results;

E.   applications for EPA COCs and CARB EOs that concealed AECDs;

F.   fraudulently-obtained EPA COCs and CARB EOs;

G.   vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

H.   documents and communications that facilitated "passing" emission tests;

I.   false or misleading communications intended to prevent regulators and the public from discovering the true nature of the emissions controls and/or AECDs;

J.   sales and marketing materials, including advertising, websites, packaging, brochures, and labeling, concealing the true nature of the Class Vehicles;

K.   documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

L.    documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

M.    payments to Bosch GmbH and Bosch LLC;

N.    millions of dollars in compensation to Denner, Hackett, and Fields;

O.    deposits of proceeds; and/or

P.    other documents and things, including electronic communications.

193.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Class Vehicles and related documents, including, for example, annual marketing brochures for each Class Vehicle model year from 2011 to 2018, distributed by Ford Motor Company to dealerships and consumers nationwide, and COC and EO applications submitted to the EPA and CARB for each Class Vehicle model year.

194.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| The Bosch Group | PR Newswire (and media network around United States) | January 12, 2011 | Press release describing Bosch's recognition for providing "clean diesel technologies" to vehicles including the Ford F-250 Super Duty Lariat at a "Diesel Shootout" event, in which Bernd Boisten, Bosch regional president for diesel systems states: <br><br> "Clean diesel technology plays a major role in helping to increase the performance of heavy-duty vehicles without sacrificing great fuel economy" and "Clean diesel technology is a |

| From | To | Date | Description |
|------|-----|------|-------------|
| | | | perfect solution for pickup trucks and we expect to see this technology continue to gain momentum in this segment in the coming years." |
| Ford, Ford Media Center | Media and driving public throughout the United States | March 5, 2014 | Press release describing the 2015 F-Series Super Duty diesel boasting "horsepower to a class-leading 440 horsepower; torque to class-leading 860 lb.-ft for all models" and touting "New injector tips spray a finer mist of fuel into the cylinders which provides a more complete burn and helps reduce noise, vibration and harshness. Other benefits include lower emissions and less fuel deposit buildup on the intake valves over time." |
| The Bosch Group | Ford | 2011-2018 | Software and calibration documentation for emissions control technology. |

195.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities. Specifically, Ford made misrepresentations about the Class Vehicles on its websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the emission standards and other performance metrics of importance to reasonable consumers nationwide.

196.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

197.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure

consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their marketing campaigns and representations to regulators to the contrary.

198.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

199.   The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c) as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

200.   The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

201.   To achieve their common goals, the RICO Defendants hid from regulators and the general public the excessive and unlawful emissions of the Class Vehicles and obfuscated the true nature and level of the emissions.

202.   The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and have participated in the common course of

conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the emissions control technology contained therein). For the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics. Specifically, the RICO Defendants committed to secrecy about the concealed AECDs in the Class Vehicles.

203.   The RICO Defendants knew and intended that government regulators would rely on their material omissions made about the Class Vehicles to approve them for importation, marketing, and sale in the United States and each state. The RICO Defendants knew and intended that consumers would purchase the Class Vehicles and incur costs as a result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they purchased illegal and defective vehicles that never should have been introduced into the U.S. stream of commerce. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material concealment and omissions made or caused to be made by the RICO Defendants; otherwise, Ford could not have obtained valid COCs and EOs to sell the Class Vehicles.

204.   As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

205.   The predicate acts had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the SDD Enterprise

and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining

Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class

Vehicles.

206.   During the design, manufacture, testing, marketing, and sale of the Class Vehicles, the

RICO Defendants shared among themselves technical, marketing, and financial information that

revealed the existence of the AECDs contained therein. Nevertheless, the RICO Defendants chose and

agreed to disseminate information that deliberately misrepresented the Class Vehicles as:

A.   being legal for sale and operation in the United States;

B.   offering "best-in-class" fuel economy;

C.   being the "[c]leanest Super Duty diesel ever;"

D.   being the "most tested Power Stroke diesel engine ever;"

E.   reducing "nitrogen oxide levels by more than 80% when compared to previous

generation diesel;"

F.   using "proven technology and innovative Ford strategies to meet the latest

federal emissions standards;"

G.   having "[u]nsurpassed diesel fuel economy;"

H.   offering "[i]mpressive diesel fuel efficiency . . . maintained with the help of

high-pressure fuel injectors that achieve a **more efficient, cleaner burn;**" and

I.   having "notably quiet, refined sound, our diesel produces the lowest NVH in the

class."

207.   Plaintiffs were injured in their business or property by loss of hard-earned money paid

when they purchased or leased a Class Vehicle that did not, and could not, perform as promised.

Plaintiffs and Class members thought they were getting the power and fuel efficiency of a working

truck, and were deceived into paying a "diesel premium" for these features, which were an illusory

benefit made possible only so long as the vehicles were cheating. As detailed above, Ford charges a premium of at least $8,000 for diesel-equipped vehicles over comparable gasoline trucks which Plaintiffs and Class members would not have paid, or would have paid less for, had they known the truth.

208.   Because of the conduct of the RICO Defendants, and specifically their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

A.   overpayment at the time of purchase or lease for Class Vehicles purportedly having "clean" properties and benefits and meeting applicable federal and state emissions standards, that did not actually have these properties or meet these standards;

B.   purchase or lease of illegal, defective Class Vehicles that were never legal for sale;

C.   diminished value of the Class Vehicles;

D.   other, ongoing out-of-pocket and loss-of-use expenses;

E.   payment for alternative transportation; and

F.   loss of employment due to lack of transportation.

209.   The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' and Class members' business and property, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

1

2

**COUNT II**
**FRAUD BY CONCEALMENT**
**(Common Law)**

3

4

210.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth

herein.

5

6

211.    Plaintiffs bring this claim on behalf of themselves and the Class against Ford and

7

Bosch.

8

9

212.    Each Defendant committed fraud by installing and calibrating emissions control devices

in the Class Vehicles, which were unlawfully concealed from regulators and consumers alike. In

10

uniform marketing materials provided with each Class Vehicle, the Ford Defendants concealed from

11

12

Plaintiffs and the Class that the emission treatment technology deactivated under real-world driving

conditions.

13

14

213.    The Ford Defendants intentionally concealed, suppressed, and failed to disclose the

15

facts that the Class Vehicles had defective emissions controls and/or emitted unlawfully high levels of

16

pollutants such as NOx. These Defendants, along with the Bosch Defendants, knew or should have

17

known the true facts, due to their involvement in the design, installment, and calibration of the

18

emission treatment technology in the Class Vehicles. And yet, at no time did any of these Defendants

19

20

reveal the truth to Plaintiffs or the Class. To the contrary, each Defendant concealed the truth,

intending for Plaintiffs and the Class to rely—which they did.

21

22

214.    A reasonable consumer would not have expected that the emission treatment technology

23

in the Class Vehicles deactivated under real-world driving conditions or that the Class Vehicles would

24

spew unmitigated NOx during city or highway driving. Plaintiffs and the members of the Class did

25

not know of the facts which were concealed from them by Defendants. Moreover, as consumers,

26

Plaintiffs and the members of the Class did not, and could not, unravel the deception on their own.

27

28

215. Defendants had a duty to disclose that the emission treatment technology is deactivated under real-world driving conditions and that the Class Vehicles spewed unmitigated NOx during real-world conditions. Defendants had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably discoverable by Plaintiffs or the members of the Class. As alleged herein, Ford employed extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Ford's deception on their own.

216. Ford also had a duty to disclose the true nature of the emissions controls in light of their statements about the qualities of the 6.7-liter Power Stroke diesel engines and the Class Vehicles' emissions levels, which were misleading, deceptive, and incomplete without the disclosure of the fact that the emission treatment technology is deactivated under real-world driving conditions and that the Class Vehicles spewed unmitigated NOx during real-world conditions. Ford held out the Class Vehicles as *reduced emission* diesel vehicles, when in fact, they were *unlawfully high* emission vehicles. Having volunteered to provide information to Plaintiffs and the members of the Class, Ford had the duty to disclose the whole truth. On information and belief, Ford has still not made full and adequate disclosures and continues to defraud Plaintiffs and the members of the Class by concealing material information regarding the emissions qualities of the Class Vehicles.

217. Had the truth been revealed, Plaintiffs and the Class would not have purchased the Class Vehicles, or would have paid less for them. Plaintiffs and the members of the Class have sustained damage because they own Class Vehicles that should never have been placed in the stream of commerce and are diminished in value as a result of Defendants' fraud. Accordingly, Defendants are liable to Plaintiffs and the members of the Class for damages in an amount to be proven at trial.

218. Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich

themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

219.   Plaintiffs plead this count pursuant to the laws of California, where Ford has its significant operations, on behalf of all members of the Class. As necessary, and in the alternative, Plaintiffs may allege sub-classes, based on the residences at pertinent times of members of the Class, to allege fraudulent concealment under the laws of states other than California.

## IX.     REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.     Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.     A declaration that any applicable statutes of limitation are tolled due to the fraudulent concealment alleged in this Complaint, and that Defendants are estopped from relying on any statutes of limitations in defense;

C.     An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

D.     A declaration that the emissions cheating software or firmware in the Class Vehicles was concealed or otherwise not disclosed to Class members and that the Class Vehicles are defective;

E.     Injunctive and equitable relief in the form of a comprehensive program to repair, modify, and/or buy back all Class Vehicles, and to fully reimburse and make whole all Class members for all costs and economic losses, and degradation of mileage performance, durability, and reliability that the Class Vehicles could incur by being brought into compliance with federal and state law;

F. Environmental reparations, mitigation, and remediation to offset the harm caused by the Class Vehicles, based on the mileage driven by all Class Vehicles and/or other appropriate measures of environmental harm;

G. Public injunctive relief necessary to protect public health and welfare, and to remediate the environmental harm caused by the Class Vehicles' unlawful emissions;

H. Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under Civil RICO, multiple damages under applicable federal and states' laws, punitive and exemplary damages under applicable laws;

I. Rescission of all Class Vehicle purchases or leases, including reimbursement and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and other fees;

J. A declaration that Defendants are financially responsible for all Class notice and administration of Class relief;

K. Any and all applicable statutory and civil penalties;

L. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

M. An award of costs and attorneys' fees;

N. Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

O. Such other or further relief as may be appropriate.

## X.  DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial.

DATED this 20th day of April, 2018.

KELLER ROHRBACK L.L.P.


By: */s/ Juli Farris* _____
    Juli Farris, SBN 141716
    KELLER ROHRBACK L.L.P.
    801 Garden Street, Suite 301
    Santa Barbara, CA 93101
    (805) 456-1496; Fax (805) 456-1497
    jfarris@kellerrohrback.com

    Lynn Lincoln Sarko, *pro hac vice forthcoming*
    Gretchen Freeman Cappio, *pro hac vice forthcoming*
    Ryan McDevitt, *pro hac vice forthcoming*
    Rachel Morowitz, *pro hac vice forthcoming*
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101-3052
    (206) 623-1900; Fax (206) 623-3384
    lsarko@kellerrohrback.com
    gcappio@kellerrohrback.com
    rmcdevitt@kellerrohrback.com
    rmorowitz@kellerrohrback.com

    Elizabeth Cabraser, SBN 83151
    Kevin Budner, SBN 287271
    Phong-Chau Nguyen, SBN 286789
    Wilson Dunlavey, SBN 307719
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
    (415) 956-1000; Fax (415) 956-1008
    ecabraser@lchb.com
    kbudner@lchb.com
    pgnguyen@lchb.com
    wdunlavey@lchb.com

    David S. Stellings, *pro hac vice forthcoming*
    Katherine I. McBride, *pro hac vice forthcoming*
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    250 Hudson Street, 8th Floor
    New York, NY 10013
    (212) 355-9500; Fax (212) 355-9592
    dstellings@lchb.com
    kmcbride@lchb.com

Benjamin L. Bailey, *pro hac vice forthcoming*
Jonathan D. Boggs, *pro hac vice forthcoming*
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555, Fax (304) 342-1110
bbailey@baileyglasser.com
jboggs@baileyglasser.com

Paul A. Geller, *pro hac vice forthcoming*
Jason Alperstein, *pro hac vice forthcoming*
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
(561) 750-3000; Fax (561) 750-3364
pgeller@rgrdlaw.com
jalperstein@rgrdlaw.com

David Boies, *pro hac vice forthcoming*
BOIES SCHILLER FLEXNER
333 Main Street
Armonk, NY 10504
(914) 749-8200; Fax (914) 749-8300
dboies@bsfllp.com

Damien Marshall, *pro hac vice forthcoming*
Alexander Boies, *pro hac vice forthcoming*
BOIES SCHILLER FLEXNER
575 Lexington Ave, 7th Floor
New York, NY 10022
(212) 446-2300; Fax (212) 446-2350
dmarshall@bsfllp.com
aboies@bsfllp.com

Stephen Zack, *pro hac vice forthcoming*
BOIES SCHILLER FLEXNER
100 SE Second Street, Suite 2800
Miami, FL 33131
(305) 539-8400; Fax (305) 539-1307
szack@bsfllp.com

No.                                   70                    CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Roland Tellis, SBN 186269
Mark Pifko, SBN 228412
BARON & BUDD
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
(818) 839-2333; Fax (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

**Attorneys for Plaintiffs**